UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARY J. FREDERICK; JOHN JUSTIN COLLIER; WILLIAM L. MARKS, JR.; MINNIE LEE CLARK; and COMMON CAUSE INDIANA, <br><br> Plaintiffs, <br><br> -v- <br><br> CONNIE LAWSON, in her official capacity as Secretary of State; ST. JOSEPH COUNTY ELECTION BOARD; and M. CATHERINE FANELLO, RITA L. GLENN, and MURRAY WINN, each in their official and individual capacities as members of the St. Joseph County Election Board, <br><br> Defendants. | Cause No. 1:19-cv- 1959 |

**EXPERT REPORT OF DR. LINTON A. MOHAMMED**

LINTON A. MOHAMMED, deposes and states that:

1. I am a Forensic Document Examiner ("FDE"), certified by the American Board of Forensic Document Examiners. I have been engaged in this matter on behalf of Plaintiffs. The information contained within this Affidavit is based upon my personal knowledge unless otherwise specified.

1

## QUALIFICATIONS

2.   I am a U.S.-certified and internationally recognized FDE, and the focus of my research and professional experience is on handwriting and signature identification and the scientific approach to analyzing questioned signatures. I am, and since 1998 continuously have been, certified by the American Board of Forensic Document Examiners (ABFDE), the certifying board for FDEs in North America. I am also certified in document examination by the Chartered Society of Forensic Sciences (United Kingdom). I specialize in the forensic science of analyzing genuine, disguised, and simulated signatures.

3.   I co-founded, and I am currently the principal at Forensic Science Consultants, Inc., where I conduct forensic document examination casework and research on handwriting and signature identification as well as other forensic document examination (e.g., document alterations, obliterations, indented impressions, or pages added or removed). I am also an adjunct professor at Oklahoma State University, where I teach graduate courses on the scientific examination of questioned documents. I previously spent approximately fourteen years conducting forensic document, handwriting, and signature examination and research at Forensic Science Consultants, Inc. doing business as Rile, Hicks, & Mohammed and Associated Document Examiners.

4.   During and prior to my time with Associated Document Examiners, and for nearly fourteen years, I worked as Forensic Document Examiner and Senior Document Examiner for the San Diego Sherriff's Department Regional Crime Laboratory. There I conducted examinations of signatures and handwriting for cases investigated by San Diego County agencies as well as by local police, state, and federal agencies. I also served as Technical Lead of the Questioned Documents Section of the Regional Crime Laboratory, trained investigators and

attorneys, provided expert testimony, conducted research, and produced the Questioned Documents Section Quality Manuals. Prior to that, I worked internationally as an FDE at the Laboratory of the Government Chemist (England), Caribbean Institute of Forensic Investigations Ltd. (West Indies), and Trinidad and Tobago Forensic Science Center (West Indies). In those roles, I conducted forensic document examinations and testified in criminal and civil cases for multiple police forces and other government agencies.

5. I am a Fellow of the Questioned Documents Section of the American Academy of Forensic Sciences (AAFS), a member and diplomate of the Chartered Society Forensic Sciences, and a member of the Canadian Society of Forensic Science. I served as the Chair of the AAFS Questioned Documents Section from 2016-2018. I am an appointed member and Vice-Chair of the Academy Standards Board, which was formed by the AAFS to develop documentary standards for the forensic sciences. I served as member of the National Institute of Standards and Technology's Expert Working Group on Human Facts in Handwriting Examination, the National Institute of Standards and Technology Organization of Scientific Area Committees Physics/Pattern Interpretation Scientific Area Committee, and the Scientific Working Group on Documents. I have previously served as President, Vice President, Treasurer, and Director of the American Society of Questioned Document Examiners (ASQDE).

6. I am the editor of the Journal of the American Society of Questioned Document Examiners.  I am an editorial review board member of the Journal of Forensic Sciences, and Forensic Science and Technology. I am also a guest reviewer for the following journals: Forensic Science International, Science & Justice, Australian Journal of Forensic Science, Egyptian Journal of Forensic Sciences, and IEEE Transactions on Cybernetics.

7. I have published sixteen articles on handwriting identification and forensic document examination. Many of my articles focus on the analysis of genuine and forged signatures and handwriting comparison. In June 2019, I published a book titled, "Forensic Examination of Signatures" which gives an account of the state of the art in signature examination. I co-authored a book in 2012 titled "The Neuroscience of Handwriting: Applications for Forensic Document Examination," which integrates research in the fields of motor control, neuroscience, kinematics, and robotics to evaluate questioned signatures and handwriting. In particular, the book sets forth, among other things, the scientific fundamentals of motor control as relevant to handwriting; the impact of age, disease, and medication on handwriting; and a quantitative approach to signature authentication, including kinematic and laboratory analyses of genuine versus disguised versus forged signatures. I have also given numerous presentations on signature examination worldwide, including in the United States, Saudi Arabia, Australia, China, Canada, Brazil, Latvia, Turkey, and Poland. A list of my publications, including those over the last ten years, is included in my *curriculum vitae* which is attached as Exhibit 1.

8. In 2019, I received the Ordway Hilton Award from the Questioned Documents Section of the American Academy of Forensic Sciences "In Recognition of Outstanding Contributions to Forensic Document Examination". In 2012, I received the American Board of Forensic Document Examiners' New Horizon Award "In Recognition of His Exceptional Contributions in Scientific Research for the Advancement of Forensic Document Examination."

9. In addition, I have testified as an expert witness more than 150 times on issues of signature, handwriting, and document examination in both civil and criminal cases, including cases in the United States, England, Trinidad & Tobago, and St. Vincent.

10. I received a Ph.D. from La Trobe University in Melbourne, Australia in human biosciences, where I wrote my thesis on signature identification: "Elucidating static and dynamic features to discriminate between signature disguise and signature forgery behavior." Prior to that, I received my undergraduate degree in science at the University of West Indies; underwent a two-year training program in document examination at the Trinidad and Tobago Forensic Science Center; and received a master's degree in forensic sciences at National University in San Diego, California.

11. I am being compensated at a rate of $400.00 per hour for examinations, depositions, and testimony, and related activities including travel time. My compensation in this matter is not in any way contingent on the content of my opinion or the outcome of this matter.

12. A Testimony Listing for the past five years is attached as Exhibit 2.

## BACKGROUND

13. Based on my review of the Signature Review sections of the 2016, 2018, and 2019 Indiana Election Administrator's Manuals, Indiana Statutes IC 3-11.5-4-11, and IC 3-11.5-4-13, I understand that Indiana law requires "that if an absentee voter board is charged with comparing the voter's signature and questions whether a voter's signature is valid, the question is referred to the county election board" (IC-3-11-10-4).

14. "In a central count county, if the county election board finds that the signature is not genuine, the board must write on the envelope the words "***The county election board has rejected this ballot because the signature of this voter is not genuine***." (IC 3-11.5-4-4)".

15. I understand that county election board and precinct officials are lay individuals, meaning that they are not required to have any training, certification, or experience in document examination or signature comparison.

16. I understand that there are no meaningful formalized state standards or procedures for election officials to compare the signature upon the application or electronic poll book with the signature upon the affidavit on the ballot envelope, transmitted affidavit under IC 3-11-4-6(h), or voter registration record.

17. I was retained by Plaintiffs to determine existing flaws, if any, in the procedures and techniques of the Indiana signature-verification process for absentee ballots as set forth in Title 3 of the Indiana Code., and more specifically IC 3-11-10-4, IC § 3-11.5-4-4, -11(a)(3), and- 13(a)(2).

18. In reaching my conclusions, I reviewed (i) Plaintiffs', County Defendants', and Lawson's responses to requests for production, which included the 2016, 2018 and 2019 Election Administrators' Manuals; (ii) the First Amended Complaint, (iii) Indiana Statutes IC § 3-11-10-4(a), 3-11.5-4-4, 3-11.5-4-11(a)(3), 3-11.5-4-13(a)(2), and (iv) academic and empirical literature, as well as additional materials referenced in this Affidavit.

19. As discovery is ongoing and documents continue to be exchanged as part of this process, I reserve the right to supplement my opinions if and when new information becomes available during the course of this litigation.

## SUMMARY OF CONCLUSIONS

20. The signature review process referenced in the 2016, 2018, and 2019 Indiana Election Administrator's Manuals, IC § 3-11-10-4(a), 3-11.5-4-4, 3-11.5-4-11(a)(3), and 3-11.5-4-13(a)(2) does not set forth functional standards for determining when a voter's signature does not match the signature on file with the election authority.

21. Indiana also does not require elections officials to have any training in signature examination, and does not require that elections officials be provided examination equipment.

Based on my experience and my review of the academic literature, it is my opinion that in these circumstances, elections officials are likely to make erroneous signature-comparison determinations.

22. Determining whether a signature is genuine is a difficult task for even a trained FDE, as signatures are written in different styles with varying levels of readability and variability. And laypersons have a significantly higher rate of error in determining whether signatures are genuine. Laypersons are also more likely to wrongly determine that authentic signatures are *not* genuine than to make the opposite error. In other words, lay elections officials are more likely than trained examiners to make an incorrect signature-comparison determination and are particularly likely to incorrectly decide that the signatures do *not* "compare."

23. In my opinion, this high rate of error among laypersons generally results from an incorrect determination that "variations" between one individual's signatures are instead "differences" between multiple individuals' signatures. An individual's signatures may vary for myriad reasons, including age, health, native language, and writing conditions. Laypersons' failure to properly account for signature variability leads to erroneous inauthenticity determinations, which are particularly pronounced in populations with greater signature variability, such as elderly, disabled, ill, and non-native English signatories.

24. These signature-determination errors are further compounded for elections officials with diminished eyesight or "form blindness" (a type of impairment in visual perception defined below)—both of which impact an individual's ability to make accurate handwriting authenticity determinations. While FDEs are screened for these traits, elections officials are not required to undergo such a screening.

25. Nor does Indiana require that election officials compare spend a minimal amount of time in making a signature determination. These omissions are likely to lead to additional erroneous determinations.

26. At a minimum, ten signature samples are recommended for an accurate signature determination to account for an individual's signature variability. In cases where an individual is impaired, elderly, or has problems signing documents, more sample signatures may be required. However, Indiana only requires elections officials to compare ballot-envelope affidavit signatures to the signature in the ballot and possibly one signature sample of the voter in the election authority's database.

27. In sum, it is my opinion that Indiana Code IC 3-11-10-4, IC § 3-11-10-4(a), 3-11.5-4-4, 3-11.5-4-11(a)(3), and 3-11.5-4-13(a)(2), which require that lay election officials, without training or adequate standards, attempt to compare voter signatures to determine whether an absentee ballot will be counted, foreseeably will result in erroneous absentee ballot rejections, and from my review of Plaintiffs' absentee ballots, has already resulted in erroneous ballot rejections.

## ANALYSIS AND OPINIONS

**A. Lay Individuals Are Likely to Make Erroneous Signature Comparison Determinations.**

28. Lay individuals are highly likely to make mistakes in making signature-comparison determinations and are particularly likely to conclude that signatures do not compare when they are in fact written by the same individual.

29. To determine whether signatures are made by the same individual or by different individuals, a reviewer needs to evaluate whether a feature or combination of features in signatures are "differences" or "variations." In the field of signature examination, unexplainable

"*differences*" between signatures mean that different individuals wrote the signatures; whereas "*variations*" between signatures mean that one individual wrote the signatures. Determining whether signature features are "differences" or "variations" is one of the most difficult determinations in forensic signature examination.

30. To make such a judgment reliably requires, at a minimum:

a) Extensive training with different types of signatures: Becoming an FDE requires at least two, generally three, years of full-time training with an experienced examiner, with at least eighteen months of training in the examination of signatures and handwriting. FDEs learn the science of signature examination, gain experience in casework, and are tested for proficiency.

b) Adequate magnification and lighting equipment.

c) Excellent eyesight.

d) Adequate time: Insufficient time examining signatures is conducive to making errors. For example, Merlino, et al. (2014),[1] found that FDEs spent more time looking at the questioned and known signatures than laypersons and were more accurate in the evaluation of the genuineness of signatures.

Without these elements, lay individuals are likely to mistake legitimate and expected "variations" between one individual's signatures for "differences" in signatures between two individuals and conclude, incorrectly, that someone other than the registered voter signed an absentee ballot envelope.

---

[1] Merlino, M., Freeman, T., Dahis, V., Springer, V., et al. (2014). *Validity, Accuracy, Reliability, and Bias in Forensic Signature Identification*. NIJ Award Number: 2010-DN-BX-K271.

31. In fact, signature verification is inherently difficult, even for a trained FDE. For one, signatures are written in three different styles[2] as illustrated in Figures 1-3:

- Text-based: Nearly all the letters can be interpreted.

*Figure 1      Example of a Text-based signature*

- Mixed: More than two, but not all, letters can be interpreted.

*Figure 2      Example of a Mixed style signature*

- Stylized: No allographs can be interpreted.

*Figure 3      Example of a Stylized signature*

These signature styles exhibit significantly different characteristics that impact a determination of whether signatures are genuine. For example, kinematic features of signatures, such as size, velocity, changes of acceleration, and pen pressure are important in determining whether a signature is genuine. Yet these kinematic features vary between the same individual's signatures,

---

[2] Mohammed, L., Found, B., Rogers, D. (2008). *Frequency of Signatures Styles in San Diego County*. J American Society of Questioned Document Examiners; 1:9-13.

with the degree of variations often dependent on the signature style. The kinematic features of stylized signatures, for example, vary more significantly than the kinematic features of text-based signatures. These variations impact a reviewer's ability to determine whether a signature is genuine and would likely cause a lay person to decide that signatures exhibit "differences" when the changes in features are simply "variations."

32. In addition, to determine whether signatures are made by the same individual, a reviewer should focus on holistic features of signatures, such as alignment, slant, pen lifts, rhythm, the size of writing, the slope or slant of the letters, or other characteristics that are diagnostic of the process used to create signatures. These features are subtle, and a writer is usually unaware of the features, as they are excited via the writer's subconscious motor program. These subtle features are significant as evidence of genuineness because they occur in naturally occurring handwriting. Lay persons, however, often focus instead on more eye-catching features in evaluating signatures. For example, an eye-tracking study on signature examination conducted by Merlino, et al. found that "lay participants focused to a greater extent on individual features such as arches, eyelets, hooks, shoulders, connections, troughs, or other individual features" that catch the eye, and "appear[ed] less likely to use holistic features." But focusing on these eye-catching features is problematic because these are also the features that a simulator will try to capture. Properly utilizing the subtle, holistic features of signatures to determine genuineness, however, requires both training and adequate time for review.

33. Further, an individual's signatures may vary for myriad reasons, and to properly determine whether signatures are written by the same individual, one must know why features of the same individual's signatures may visually appear different. In one of the leading textbooks

11

on handwriting examination, authors Roy Huber & A.M. Headrick[3] identified twenty reasons an individual's signatures many vary:

a) Adequacy of standards—inadequate standards in terms of quantity and contemporaneousness will not be representative of the writer's range of variation. Variations may therefore be interpreted as differences.

b) Accidental occurrences—i.e., these are one-off variations that will not appear in the specimen signatures. Misinterpretation may lead to a decision of difference versus variation.

c) Alternative styles—i.e., some writers have alternate signatures styles. This may not be represented in the specimens.

d) Ambidexterity.

e) Carelessness or negligence.

f) Changes in the health condition of writer.

g) Changes in the physical condition of writer—e.g., fractures, fatigue, or weakness may alter features of an individual's signature.

h) Changes in the mental condition or state of the writer.

i) Concentration on the act of writing.

j) Disguise or deliberate change.

k) Drugs or alcohol.

l) Influence of medications.

m) Intentional change for later denial.

---

[3] Huber, R. A. & Headrick, A.M. (1999). *Handwriting Identification: Facts and Fundamentals*. CRC Press, Boca Raton, FL.

n) Nervous tension.

o) Natural variations—i.e., inherent variation as a result of differences in neuro-muscular coordination.

p) Writing conditions—e.g., the individual's place or circumstances, such as in a moving vehicle or at a stationary table.

q) Writing instrument—e.g., a pen versus a stylus.

r) Writing position—e.g., the individual's stance.

s) Writing surface—e.g., paper versus electronic screen.

t) Writing under stress.

Examiners must consider each of these reasons in determining whether a feature is "different" between two signatures or whether the feature is simply a "variation" from the same writer. A lay individual will not have the knowledge, training, and experience to properly account for these factors.

34. In addition, the signatures of poorly educated writers, writers for whom English is a second language, elderly writers, disabled writers (discussed in more detail below), and ill writers are more likely to exhibit wide ranges of variation. For instance, a writer who first learned to write in a non-Latin-based script, such as Chinese, will naturally show more variation when signing a document in English than a native writer. Likewise, where the voter's native script is written right to left, such as Urdu, the voter's signature may also be more likely to show variations in letter slanting. Qualified, experienced experts in the area of signature verification would know and account for these factors in evaluating signatures; lay people, even if put through a short training session, are unlikely to be able to accurately account for these

13

differences, particularly in an expedient time frame or when only one or a few samples are available for comparison.

35. Laypersons also may have an issue called "form blindness" that impacts their ability to make consistently correct determinations as to the genuineness of a signature. Form blindness is defined by Byrd and Bertram as "a combined physical and mental fault, an imperfection in the brain which causes the inability to interpret and correctly store what is actually focused on the human retina."[4] Form blindness affects "the ability to see minute differences in angles, forms, and sizes."[5] Most ophthalmologists agree that form perception is not an eye problem but rather a translational problem. Therefore, in most cases, form blindness goes undetected.[6] Form blindness, however, diminishes a reviewer's ability to make accurate determinations of a signature's genuineness. In *Questioned Document Problems*, considered an authoritative text in document examination, Albert S. Osborn reviews the effects of form blindness and concludes that "[i]n disputed document cases . . . difficult problems should not be submitted to untrained jurors, or judges, who are even only partially [form] blind."[7] Osborn's conclusion is further supported by a study with latent print (fingerprint) examiners, which showed that examiners who exhibited form blindness were significantly less likely to make accurate fingerprint comparisons. Signature comparison, like fingerprint comparison, is inherently reliant on the ability of the examiner to observe and retain fine details; thus, a reviewer who is form blind will be

---

[4] Byrd, J. & Bertram, D. (2003). *Form-blindness*. J. Forensic Identification 53 (3).

[5] Bertram, Dean James, "Form Blindness Testing: Assessing the Ability to Perform Latent Print Examination by Traditional Versus Nontraditional Students" (2009). Dissertations. 996 http://aquila.usm.edu/dissertations/996.

[6] *Id.*

[7] Osborn, A.S. (1991). *Questioned Document Problems 2nd Ed., Chapter XXIV* Montclair, New Jersey Patterson Smith.

particularly likely to make egregious errors in calling a signature genuine or non-genuine. But while FDEs must pass a form blindness test before being trained in handwriting identification, Indiana requires no such test for elections officials. There is thus a risk that some Elections officials have form blindness and are particularly prone to making erroneous signature determinations.

36. Ultimately, laypersons make significantly more errors in determining the genuineness of signatures than FDEs. The most pronounced difference is in so-called Type II error rates, in which authentic signatures are declared non-genuine. In a 2001 study comparing the error rates of FDEs with the error rates of laypersons in comparing six genuine signatures with six non-genuine signatures, laypersons made Type II errors in 26.1% of cases while trained signature FDEs made such errors in 7.05% of cases.[8] That means that laypersons are more than 3 ½ times more likely to declare an authentic signature non-genuine—which, in the case of absentee ballot signatures, would mean that elections officials would reject more than 3 ½ times the number of ballots than FDEs.

37. This study also found that laypersons are much more likely to make these Type II errors than Type I errors (Type I meaning an incorrect determination that non-genuine signatures are authentic), although laypersons are still substantially more likely to make Type I errors than trained FDEs (laypersons made Type I errors in 6.47% of cases while trained FDEs made such errors in 0.49% of cases).[9] A Type II error is considered among FDEs as being more egregious than a Type I error for signature verification and would mean in Indiana's absentee balloting system that a genuine signature is called non-genuine, and the voter's ballot rejected incorrectly.

---

[8] Kam M., Gummadidala K., Fielding G., Conn R. (2001). *Signature authentication by forensic document examiners*. J. Forensic Sci., 46 (4):884-888.

[9] *Id*.

38. Similarly, a study conducted in Australia found that FDEs were statistically better than laypersons in determining genuineness or non-genuineness. The FDE group had a 3.4% error rate while the laypersons had a 19.3% error rate.[10] It must be noted that these error rates occurred when adequate signature samples and examination time were available. It can safely be assumed that the error rate will rise when inadequate comparison samples and time are available to the screener.

39. It must be also noted that laypersons are even more likely to incorrectly find authentic signatures of poorly educated writers, writers for whom English is a second language, elderly writers, disabled writers, and ill writers to be non-genuine. The increased variations in the signatures of these groups only compound laypersons' tendencies to err on the side of incorrectly finding authentic signatures to be non-genuine.

**B. Even Trained Forensic Document Examiners Are Likely to Make Erroneous Signature Comparison Determinations Under Indiana's Standards for Examining Absentee ballots.**

40. Even for trained FDEs, Indiana's absentee ballot signature comparisons are prone to erroneous determinations due to the limited number of comparison signatures, and the lack of proper equipment.

41. Normally, FDEs require multiple specimen signatures for comparison with a questioned signature, and often more if issues such as age or illness are involved. These specimens are required to adequately determine the range of variation of the writer and properly account for the reasons for variation within an individual's signatures discussed above. Indeed, nobody signs the same way twice: no two complex, skillfully written, genuine signatures of one

---

[10] Sita, J., Found, B., & Rogers, D. (2002). *Forensic handwriting examiners expertise for signature comparison*. J. Forensic Sci. 47(5).

writer have ever been found to be exactly alike at the microscopic level. This is so because signatures are the product of a motor program developed in the brain after practice and then executed with neuro-muscular coordination, and many factors can influence an individual's motor program and neuro-muscular coordination, including the factors discussed above. Inadequacy of standards is cited as a source of error by Huber & Headrick.[11] Inadequate standards means that the writer's range of variation is not represented fully. Features observed in the questioned signature(s) may not be observed in the inadequate specimens. This may lead to an erroneous interpretation of a feature as a difference (two writers) or variation (one writer). Elections officials, however, are required to compare the absentee ballot signature with only the voter signature(s) on file.

42. Figure 4 provides illustrations of rejected voter's signatures in St. Joseph County, juxtaposed with genuine samples of the voters. Note the variation in the genuine samples, which the elections officials could not assess due to their lack of adequate voter exemplar signatures. The voters' signatures in the names of William J. Marks, Jr., and John Justin Collier clearly fall within the range of variation of each individual. The sample signatures of Mary J. Fredericks display a wide range of variation, and rejecting this voter's absentee ballot signature based on a very limited number of sample signatures on file is very susceptible to error. The signature of voter Minnie Lee Clark exhibits poor line quality. However, this is to be expected in an individual who is 99 years old. It is very likely that her normal course-of-business signatures will exhibit wide variation and poor line quality which can be easily mistaken by an untrained person as evidence of simulation by another writer.

---

[11] Huber, R.A. & Headrick, A.M. (1999). *Handwriting Identification: Facts and Fundamentals*. CRC Press, Boca Raton, FL.

*Figure 4 Comparison chart of rejected and known voters' signatures*

| VOTER'S NAME | REJECTED BALLOT SIGNATURE | VOTER SAMPLE SIGNATURE(S) |
|---|---|---|
| WILLIAM L. MARKS, JR | *[signature]* 10/25/18 | *[signature]* 05/04/17<br>*[signature]* Advertiser Signature<br>OTHER LEGAL RESPONSIBILITIES OF AN AGENT.<br>*[signature]* William L. Marks, Jr.<br>10/03/03 |
| MINNIE LEE CLARK | *[signature]* 10/31/18 | *[signature]* 04/01/19 |
| MARY J. FREDERICK | *[signature]* 10/07/18 | *[signature]* 10/01/19<br>*[signature]* 07/11/18<br>*[signature]* 12/08/16 |
| JOHN JUSTIN COLLIER | *[signature]* 10/25/18 | *[signature]* 04/23/19<br>*[signature]* 06/21/11 |

43. Finally, as discussed above, Indiana law does not require election officials to be provided proper equipment, such as magnification and lighting equipment. Without this equipment, even a well-trained eye may make errors in a signature authenticity determination.

44. For the reasons stated herein, it is my professional opinion that Indiana election officials are likely to make erroneous determinations of whether absentee ballot-envelope affidavit signatures match the signatures on file with the election authority, and, in particular,

18

determine that authentic signatures are not genuine; that they have made such erroneous determinations in the past, and these erroneous determinations are foreseeable. These erroneous determinations result from an inherent difficulty in making reliable forensic signature determinations, a system in which adequate comparison signatures and equipment are unavailable, and the ability of untrained laypersons to distinguish between signature variations of one individual and signature differences between multiple individuals. In this context, an incorrect signature determination can lead to a voter's absentee ballot being rejected even though the signature on the voter's ballot was written by the same individual who wrote the signature on file with the election authority.

45. I declare the foregoing to be true to the best of my knowledge and understanding of the facts and issues in this matter.

Executed at *Burlingame, CA* on *October 17,* 2019.

*Linton Mohammed*
Linton A. Mohammed, Ph.D., D-ABFDE