UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARY J. FREDERICK, JOHN ))
JUSTIN COLLIER, WILLIAM L. )
MARKS, JR., MINNIE LEE CLARK, )
and COMMON CAUSE INDIANA, )
)
Plaintiffs, )
)
-v- )        Case No. 1:19-cv-1959-SEB-MJD
)
CONNIE LAWSON, )
)
Defendant. )

**PLAINTIFFS' BRIEF IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Plaintiffs, Mary J. Frederick, John Justin Collier, William L. Marks, Jr., Minnie Lee

Clark, and Common Cause Indiana, by counsel, hereby file their brief in support of their Motion

for Summary Judgment [ECF 67], and response to Defendant's Motion for Summary Judgment

[ECF 63], pursuant to this Court's order. [ECF 57.]

I.    **Introduction**

The individual plaintiffs were entitled to cast absentee ballots by mail, pursuant to

Indiana law. They did so in the 2018 general election, in accordance with the instructions on the

absentee ballot return envelope. The St. Joseph County Election Board received these mail-in

ballots in a timely fashion, but determined, without the use of any standards, rules or guidelines,

that the signatures on the return envelope were not genuine, and therefore rejected the ballots.

The individuals were not notified of the rejection by any governmental agency, nor were they

given any chance to contest the rejection or the determination that their signatures were not

genuine. The individuals were given no opportunity to cure the alleged defect. For the foregoing

reasons, and because Indiana law permits such ballot disqualification without the use of any standards, rules or guidelines, Defendant has violated the rights guaranteed to Plaintiffs by the Fourteenth Amendment's Due Process and Equal Protection Clauses. Because the undisputed material facts establish this claim, Plaintiffs are entitled to summary judgment as a matter of law and Defendant's Motion for Summary Judgment should be denied.

## II.   <u>Summary of Relevant Indiana Law</u>

Under Indiana law, a person who cannot be physically present to vote at the polls or is age 65 or older on election day and otherwise qualified to vote may participate in the electoral process by submitting an absentee ballot 1) by mail, 2) by in-person "early voting" in the office of the circuit court clerk, or 3) by traveling board. This case involves mail-in absentee voting. A registered voter has a statutory right to vote by mailing-in an absentee ballot if the voter meets one of several statutory qualifications, including:

1) Having a specific, reasonable expectation of being absent during the entire 12 hours that the polls are open on election day;
2) Being a voter with disabilities;
3) Being an "elderly" voter, elsewhere defined as being a voter at least 65 years of age, I. C. § 3-5-2-16.5; or
4) Being scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls are open on Election Day.

I.C. § 3-11-10-24(a)(1), (4), (5) and (7), respectively; *and see* I.C. § 3-11-10-25.

A voter who wishes to submit an absentee ballot by mail must first make a timely written application for an absentee ballot to vote by mail on a state-approved official form, which must be received by the circuit court clerk or other designated office not earlier than the date the registration period resumes following an election and not later than 11:59 p.m. (prevailing location time) twelve (12) days before election day, if the application is mailed, emailed, faxed or hand-delivered. I.C. §§ 3-11-4-3, 4.

The county election board or absentee voter board in the office of the circuit court clerk "upon receiving an application for an absentee ballot" must examine the application to determine, among other things, if "the signature of the voter on the application substantially conforms with the signature of the voter on the voter registration record, or that any substantial difference between the signatures can be accounted for by age or disability of the voter…" I.C. § 3-11-4-17.5(a). If absentee voter board members cannot reach agreement with respect to the foregoing questions, the issue "shall be referred to the county election board for determination…" I.C. § 3-11-4-17.5(a)(4). The statute is silent with respect to what happens if county election board is unable to resolve the dispute unanimously, or if it decides that the signatures on the application do not "substantially conform."

 A member of an absentee voter board or county election board may file an affidavit (ABS-20) alleging that the application has not been executed or filed in accordance with Indiana law, and the approval or denial of the application "shall be referred to the county election board, which shall promptly conduct a hearing on the matter," and may refer the matter to appropriate prosecuting attorney. I.C. § 3-11-4-18.5-18.5(a), (c) and (d).

The absentee voter must sign the affidavit provided on the outside of the security envelope to affirm that s/he personally marked the ballot and is a qualified voter. I.C. § 3-11-10-1. Proof of identification is not required. I.C. § 3-11-10-1.2. An absentee ballot submitted by mail must be received not later than noon on election day. I.C. § 3-11.5-4-7. "Upon receipt of an absentee ballot, a county election board shall immediately examine the signature of the absentee voter to determine its genuineness." I.C. § 3-11-10-4(a); *see also* § 3-11.5-4-11(a)(3) (absentee ballot counters in the presence of the county election board shall "compare the signature upon the application or electronic poll book with the signature upon the affidavit on the ballot

envelope…or voter registration record"). Questions whether a voter's signature on the security envelope are "valid" are referred to the county election board. I.C. § 3-11-10-4(a).

Excerpts from 2020 Election Administrator's Manual [hereinafter "Manual," ECF 67-1], states that "some deference in determining the genuineness of a voter's signature should be given to voters with disabilities" [ECF 67-1 at 31 (int. p. 116)],[1] but this is not supported by any statutory reference and does not appear to apply except to the review of the absentee ballot *application* per I.C. § 3-11-4-17.5(a). There is also no "deference" language in I.C. §§ 3-11-10-4, 3-11.5-4-4, 3-11.5-4-11(a)(3), 3-11.5-4-12(b)(2), or 3-11.5-4-13(a)(2). And while I.C. § 3-11.5-4-13(b) and (c) allow a disabled voter who "is unable to make a signature" on an application or security envelope that "corresponds with the voter's signature," voters have no way of knowing in advance whether their signature will subsequently be deemed to "correspond with" another signature on file.

If a county election board finds that a voter's signature is not genuine, the board must write on the envelope the words: *"The county election board has rejected this ballot because the signature of this voter is not genuine."* I.C. § 3-11.5-4-4 (emphasis added). If an absentee ballot is rejected based on signature comparison, the county election board shall issue a certificate allowing the voter to vote in person, but only "if the voter appears in person before the board not later than 5 p.m. on election day." I.C. § 3-11.5-4-13(f). However, because Indiana law does not require that voters be notified of the rejection of an absentee ballot based on a signature comparison, such a voter, like the individual Plaintiffs here, will not be aware that his or her absentee ballot was rejected, much less know that she must return to the polls to vote in person by 5:00 p.m. on election day.

---

[1] Citations to page numbers of filed documents are to the page number of the filed document (e.g. ECF 154 at 17 is the 17th page of Filing No. 154). Additionally, citations to some filed documents, such as excerpts of deposition transcripts, will also cite to internal ("int.") page numbers when they differ from the ECF number, and line numbers when appropriate.

All Indiana counties are required to count absentee ballots at a central location as of July 1, 2019. I.C. §§ 3-11.5-1-1.1, -2-2. Counting of mailed-in absentee ballots must begin no later than noon on election day; and in certain counties using electronic poll books the county election board may adopt a unanimous resolution to permit absentee ballot counting at any time after 6 a.m. on election day. I.C. § 3-11.5-4-11(d).

A security envelope containing a mailed-in absentee ballot may be opened and the ballot removed only if the counters find, among other things, that the "signature on the application corresponds to the signature on the absentee ballot affidavit." I.C. § 3-11.5-4-12(b)(2). That review process may be conducted "at any time after receipt of an absentee ballot by the county election board." *Id.* at -12(a). An absentee ballot rejected because of signature issue must be endorsed with the words, "Rejected" followed by the reason for the rejection. I.C. § 3-11.5-4-14(a). County election boards are required by federal law to establish a free access system enabling a provisional voter to determine if his vote was counted and if not, the reason it was not. I.C. § 3-11.7-6-3(a). However, Indiana does not tell a voter who mailed-in an absentee ballot if their absentee ballot was rejected and if so for what reason. (*See*, e.g., http://indianavoters.in.gov, last accessed March 2, 2020.)

Unlike I.C. §§ 3-11.5-4-4 and -13(b)(2), other provisions of Indiana law requiring signature comparisons in different contexts are more explicit. For instance, I.C. 3-5-6-1, *et seq.*, which is used to determine whether a registered voter has signed a document required or permitted to be certified by a county voter registration office, states that a county registration office is required to resolve a reasonable doubt in favor of the registered voter and certification of her/his signature as valid. I.C. § 3-5-6-2. It also requires certification of a signature despite "minor variations from the voter's name." I.C. § 3-5-6-3. It further requires that signatures "substantially conform," taking into account "age, disability, or impairment of the voter." I.C. §

5

3-5-6-6. Another statute governing the validity of signatures on remonstrance petitions, I.C. § 6-1.1-20-11, imposes a "reasonable doubt" standard and requires consideration of a lack of conformity reasonably attributable to "age, disability, or impairment."

The "reasonable doubt," "substantial conformity," and deference based on disability, age, or impairment language in these other statutes *do not* apply to the signature review process that must take place after a mail-in absentee ballot is received. The signature-matching statutes do not require any notification to the voter whose signature has been determined not to be genuine. Thus, that voter has no opportunity to contest a finding of a non-genuine signature, which is final and unreviewable.

## III.   **Statement of Material Facts**

Pursuant to S.D. Ind. L.R. 56-1, Plaintiffs hereby identify the following material facts not in dispute supporting their Cross-Motion for Summary Judgment; and material facts in dispute to opposition to Defendant's Motion for Summary Judgment.

### A.   **Statement of Material Facts not in Dispute Supporting Plaintiffs' Cross-Motion for Summary Judgment.**

The Plaintiffs[2]

1.     Plaintiff Mary J. Frederick is an Indiana resident, over 65 years of age, and cast a mail-in absentee ballot in the 2018 general election due to her age and health. [Declaration of Mary J. Frederick, ECF 67-3, p. 1, ¶ 2.]

2.     Frederick was never notified by any election official that her mail-in ballot could be rejected based on a perception that her signature was not genuine or that it did not match other signatures on file, or that it was rejected. [*Id.* at 2, ¶¶ 3, 6.] Frederick did not learn her ballot was rejected because her signature on the ballot security envelope was determined to be "not genuine," until February 2019. [*Id.*, ¶ 3.]

---

[2] Facts regarding all Plaintiffs follow, save for those relating to Minnie Lee Clark, who was over 65 and cast a ballot by traveling board, which was then erroneously rejected because her signatures allegedly did not match. [ECF 14, p. 9, ¶ 3.] Ms. Clark's power of attorney, Forestine Blake-Jackson, has attested to the fact that Ms. Clark has experienced considerable health issues over the past several months. [Affidavit of Forestine B. Jackson, ECF 67-2 at 1-2, ¶¶ 2-5.]

3.      Frederick's signature varies, and the signature on her ballot security envelope is hers. [ECF 67-3 at 2, ¶¶ 4, 5.] Frederick would like to vote by mail-in absentee ballot in the future, and is worried her ballot will again be rejected, and her vote not counted. [*Id.*, ¶ 7.]

4.      Plaintiff John Justin Collier was an Indiana resident who was eligible to cast a mail-in absentee ballot in the 2018 general election and did so because he expected to be out of the county on election day. [Declaration of John Justin Collier, ECF 67-4, p. 1, ¶ 2.]

5.      Collier was never notified by any election official that his mail-in ballot could be rejected based on a perception that his signature was not genuine or that it did not match other signatures on file, or that it was rejected. [*Id.* at 2, ¶¶ 3, 6.] Collier did not learn his ballot was rejected because his signature on the ballot security envelope was determined to be "not genuine," until February 2019. [*Id.*, ¶ 3.]

6.      Collier's signature varies, and the signatures on his ballot security envelope and absentee ballot application are his. [*Id.*, ¶¶ 4, 5.]

7.      Plaintiff William L. Marks, Jr., is an Indiana resident who was over 65 years of age and cast a mail-in absentee ballot in the 2018 general election due to his age and because we would be out of the county on election day. [Declaration of William L. Marks, Jr., ECF 67-5, p. 2, ¶ 2.]

8.      Marks was never notified by any election official that his mail-in ballot could be rejected based on a perception that his signature was not genuine or that it did not match other signatures on file, or that it was rejected. [*Id.*, ¶¶ 3, 6.] Marks did not learn his ballot was rejected because his signature on the ballot security envelope was determined to be "not genuine," until February 2019. [*Id.*, ¶ 3.]

9.      Marks' signature varies, and the signatures on his ballot security envelope and absentee ballot applications are his. [*Id.*, ¶¶ 4, 5.] Marks would like to vote by mail-in absentee ballot in the future, and is worried his ballot will again be rejected, and his vote not counted. [*Id.*, ¶ 7.]

10.     Plaintiff Common Cause Indiana ("CCI") is the Indiana affiliate of Common Cause, a national non-profit, non-partisan grassroots organization that advocates in favor of ethics, good government, campaign finance reform, constitutional law, and the elimination of barriers to voting. [Affidavit of Julia Vaugh, ECF 67-6, pp. 1-2, ¶ 3.]  The organization has more than 14,000 members who live and vote in Indiana. [*Id.* at 2, ¶ 4.]

11.     CCI works to expand and protect equal access to voting, by lobbying for non-partisan redistricting; increasing the number of satellite voting locations; and partnering with community organizations to provide education and training voting rights activists. [*Id.*, ¶ 5.]

12.     Julia Vaughn is the sole employee of CCI, with which she has been associated since 1995. [*Id.* at 1-2, ¶¶ 2, 6.] She is responsible for policy development, lobbying, grassroots organizing, and coalition building. [*Id.* at 2, ¶ 7.]

13.     CCI has a limited budget and must make hard choices about how to use its limited resources. [ECF 67-6 at 2, ¶ 8.]

14.     The Indiana statutes at issue here burden the right to vote by increasing the  risk that absentee voters will have their ballot rejected and not counted due to a perception by untrained election officials, acting in the absence of statutory standards or criteria, that the signature on the security envelope containing their absentee ballot is not "genuine" because it is perceived not to "correspond" to the signature on that voter's absentee ballot application or signature on file with the State of Indiana. [*Id*. at 2-3, ¶ 9.]

15.     This risk of disenfranchisement is heightened because Indiana provides no notice or warning to absentee voters that their signature will be scrutinized; that their ballot may be rejected if deemed not to be genuine based entirely on a visual comparison; and that they thus should be sure to sign their name as legibly as possible. [*Id*. at 3, ¶ 10.] This risk is further heightened because Indiana law contains no requirement that voters whose mail-in absentee ballot is rejected due to a signature mismatch issue be notified that their absentee ballot has been rejected or given an opportunity to challenge that rejection. [*Id*., ¶ 11.] As a result, absentee voters are not even made aware that their absentee ballot was rejected. [*Id*.]

16.     CCI knows of voters whose absentee ballots were rejected without the voters even knowing about such rejection, because in late 2018 it made requests under the Indiana Access to Public Records Act to various county election boards, as well as a follow-up survey to voters whose absentee ballots were rejected due to a perceived non-genuine signature. [*Id*. at 4, ¶ 12.]

17.     The Indiana statutes challenged in this case harm CCI's mission of expanding access and reducing barriers to voting by increasing the risk that a mail-in absentee ballot will be erroneously rejected without notice to the voter or opportunity to contest that rejection. [*Id*., ¶ 13.] These statutes thus impose additional burdens on CCI that take time and resources away from lobbying and advocacy efforts on other issues, including, but not limited to, nonpartisan gerrymandering and expanding early satellite voting and mail-in absentee voting. [*Id*.]

18.     CCI devoted time and resources to notifying its members of the risks of mailing in an absentee ballot, after becoming aware that absentee voters were having their ballots rejected based on subjective signature comparisons without notice or opportunity to cure.  It also plans to conduct training sessions aimed at educating voters and community activists about the increased risk of erroneous absentee ballot rejections. [*Id*., ¶ 14.]

19.     CCI regularly conducts citizen advocacy trainings for members and the general public. [*Id*. at 5, ¶ 15.] Due to that effect of the challenged statutes, CCI will change its curriculum and presentation materials to address the increased risk of voters having their absentee ballot rejected due to a perception by election officials that a voter's signature was not "genuine" or that it did not correspond to the voter's signature on his/her application for an absentee ballot. [*Id*., ¶ 17.]

20.     CCI will spend a greater portion of the fixed amount of time it has for these sessions discussing these concerns about mail-in absentee ballots, which necessarily diverts from time that we could spend talking about other election-related issues. [*Id*., ¶ 18.]

8

21.     CCI has expended and will continue to expend time addressing the effects of the challenged statutes necessarily diverting time that the it spends on its other advocacy, education, voter assistance, and lobbying efforts, as well as its education and assistance related to other issues by poll monitors and CCI volunteers on election day. [ECF 67-6 at 5-6, ¶ 19.]

22.     Common Cause's concerns about the wrongful rejection of absentee ballots based on signature comparisons are heightened because more than half of its members are 65 years of age or older who are thus entitled by Indiana law to vote by mailing in an absentee ballot, and who may have their absentee ballot erroneously rejected based on their signature comparison without ever being notified or given an opportunity to contest that rejection. [*Id.* at 6, ¶ 20.]

23.     Based on her review of Dr. Linton A. Mohammed's expert analysis and report submitted in this case in which he opines about the high error rate resulting from untrained election workers examining signatures to determine their genuineness, and her personal knowledge of the advanced age of a majority of the members of CCI, Vaughn believes there to be a statistical certainty, or, at the very least, a realistic likelihood, that at least one member of CCI has had their mail-in absentee ballot rejected due to a perceived signature mismatch and that other members will have their mail-in absentee ballot rejected for that reason in the future. [*Id.* at 6-7, ¶ 21.]

Expert Opinions

24.     Dr. Linton A. Mohammed is a certified and recognized Forensic Document Examiner ("FDE"), whose research and professional experience focuses upon handwriting, signature identification, and the scientific approach to analyzing questioned signatures. [Excerpts from the Expert Report of Dr. Linton A. Mohammed, ECF 67-7, pp. 1-2, ¶¶ 1-2.] A summary of his expert opinions in this matter follow, from Facts 25-35.

25.     The signature review process referenced in the 2016, 2018, and 2019 Indiana Election Administrator's Manuals, and in I.C. § 3-11-10-4(a), 3-11.5-4-4, 3-11.5-4-11(a)(3), and 3-11.5-4-13(a)(2) does not set forth functional standards for determining when a voter's signature does not match the signature on file with the election authority. [*Id.*, p. 6, ¶ 20.]

26.     Indiana does not require elections officials to have any training in signature examination, and does not require that elections officials be provided examination equipment. In these circumstances, elections officials are likely to make erroneous signature-comparison determinations. [*Id.*, pp. 6-7, ¶ 21.]

27.     Determining whether a signature is genuine is a difficult task for even a trained FDE, as signatures are written in different styles with varying levels of readability and variability. [*Id.*, p. 7, ¶ 22.]

28.     Laypersons have a significantly higher rate of error than trained examiners in determining whether signatures are genuine. [*Id.*] Laypersons are also more likely to wrongly determine that authentic signatures are *not* genuine than to make the opposite error. [*Id.*]

29.     Lay elections officials are more likely than trained examiners to make an incorrect signature-comparison determination and are particularly likely to incorrectly decide that the signatures do *not* "compare." [ECF 67-7 at 7, ¶ 22.]

30.     The high rate of error among laypersons generally results from an incorrect determination that "variations" between one individual's signatures are instead "differences" between multiple individuals' signatures. [*Id.*, p. 7, ¶ 23.]

31.     An individual's signatures may vary for myriad reasons, including age, health, native language, and writing conditions. [*Id.*] Laypersons' failure to properly account for signature variability leads to erroneous inauthenticity determinations, which are particularly pronounced in populations with greater signature variability, such as elderly, disabled, ill, and non-native English signatories. [*Id.*]

32.     Signature-determination errors are further compounded for elections officials with diminished eyesight or "form blindness," which impact an individual's ability to make accurate handwriting authenticity determinations. While FDEs are screened for these traits, elections officials are not required to undergo such a screening. [*Id.*, ¶ 24.]

33.     Indiana law does not require that election officials spend a minimal amount of time in making a signature determination, which is likely to lead to additional erroneous determinations. [*Id.*, p. 8, ¶ 25.]

34.     At a minimum, ten signature samples are recommended for an accurate signature determination to account for an individual's signature variability. When an individual is impaired, elderly, or has problems signing documents, more sample signatures may be required. But Indiana only requires election officials to compare the ballot-envelope affidavit signature to one or possibly two other samples. [*Id.*, ¶ 26.]

35.     I.C. §§  3-11-10-4, 3-11-10-4(a), 3-11.5-4-4, 3-11.5-4-11(a)(3), and 3-11.5-4-13(a)(2), which require that lay election officials, without training or adequate standards, attempt to compare voter signatures to determine whether an absentee ballot will be counted, has resulted, and will result, in erroneous ballot rejections. [*Id.*, ¶ 27.]

36.     In a 2001 study, laypersons were noted to make Type II errors – declaring an authentic signature non-genuine – in 26.1% of cases, while FDEs made such errors in 7.05% of cases. [*Id.*, p. 15, ¶ 36.]

<u>Norma Blake</u>

37.     Norma Blake is a volunteer for CCI, where she reports to Ms. Vaughn. Ms. Blake worked on a project for CCI, where she reviewed documents obtained by CCI, and obtained and processed public records requests for mail-in absentee ballots that were rejected for signature mismatch in the 2018 Indiana general election. [Declaration of Norma Blake, ECF 67-8, p. 2, ¶¶ 4, 7.]

38.     Ms. Blake contacted several county election boards in the state's most populous counties to request records related to signature mismatches, and received, logged, examined, analyzed, and quantified the resulting records. She performed these duties carefully, thoroughly, rationally, and impartially without preconceptions. [ECF 67-8, pp. 2-3, ¶ 8.]

39.     Records were requested from 19 counties for all mail-in absentee ballots cast in the 2018 general election that were rejected based on the signature comparison required by Indiana law. 18 counties provided responsive documents, though their quality, quantity, and organization was extremely uneven and inconsistent. Ms. Blake summarized her findings as follows:

a.  Ten (10) counties reported zero ballots having been rejected for signature mismatch. Those counties are:
Bartholomew, Boone, Clark, Delaware, Floyd, Kosciusko, La Porte, Monroe, Porter, and Vanderburgh.

b.  Eight (8) counties reported rejecting ballots for signature mismatch. The differential between the highest rate of rejection (.7% for St. Joseph Co.) and the lowest rate of rejection (.1% for Allen, Howard, and Tippecanoe Counties) is 700%:

| County | Total Absentee Voters by Mail | Ballots Rejected for Signature Mismatch | Ballots Rejected, as % of Total Absentee by Mail Voters |
|---|---|---|---|
| Allen | 8,328 | 8 | .1% |
| Elkhart | 3,381 | 10 | .3% |
| Howard | 1,843 | 1 | .1% |
| Lake | 8,078 | 32 | .4% |
| Madison | 3,897 | 13 | .3% |
| Marion | 17,944 | 73 | .4% |
| St. Joseph | 5,989 | 39 | .7% |
| Tippecanoe | 1,723 | 1 | .1% |

[*Id.*, pp. 3, ¶ 9.]

40.     Ms. Blake noted that 39 mail-in absentee voters in St. Joseph County were disenfranchised based on perceptions of election officials that signatures did not match between the voter's security envelope and either their application or the signature in the state's registered voter database. [*Id.*, p. 5, ¶ 15.]

41.    Ms. Blake formed her opinions in this matter based on her rational perceptions. These opinions are not based on any specialized knowledge, for she has no training or experience in forensic signature or handwriting analysis. [ECF 67-8, p. 6, ¶ 17.]

42.    Ms. Blake concluded that: 1) at least 177 mail-in absentee ballots submitted in the 2018 general election were rejected because of a signature mismatch perception by untrained election officials; 2) at least that many voters were disenfranchised as a result; and 3) only Lake County appears to have systematically contacted affected voters to inform them that their ballots were rejected, but too late for them to challenge that rejection or to vote in person on election day. [*Id.*, ¶ 18.]

43.    Despite the best efforts of election workers to perform these signature comparison duties diligently and impartially, as Dr. Mohammed's report shows, human error is inherent in evaluating signatures for mismatch, especially where election workers are not trained in signature or handwriting analysis. [*Id.*, ¶ 19.]

44.    Ms. Blake observed there is a lack of notice to voters whose absentee ballots are rejected based on signature comparison by untrained election workers; and that Indiana law does not require that absentee voters be warned to sign legibly and consistently or their ballot may be rejected. For example, the Absentee Voter's Bill of Rights that is sent out by law with each absentee ballot packet contains no such cautionary language. [*Id.*, ¶ 20, *and see* the Absentee Voter's Bill of Rights, ECF 67-9.[3]]

45.    Ms. Blake observed that based on the variation between counties in the numbers and rates of ballots rejected based on signature comparison, different counties appear to apply different standards when implementing the signature comparison laws, resulting in some rejecting a larger percentage of absentee ballots, and others rejecting a smaller percentage, if any. [ECF 67-8, p. 6, ¶ 21.]

46.    Ms. Blake noted that recordkeeping from one county to another varies widely. Some counties (e.g., Howard, Lake) strictly adhere to I.C. § 3-11.5-4-4, and clearly document rejected absentee ballots and the reason for the rejection on the ballot envelope in all but a few instances while others do not. Lake and Howard clearly document two sets of initials for the outcome of their signature reviews. Lake County assigns codes for the reasons for rejection; and beginning in 2018, implemented a practice of informing voters by form letter after every election (though not until after election day) if their absentee ballot was rejected, and providing the reason for rejection. Lake County reported a "substantial" reduction in the number of ballot rejections for the 2019 Primary Election after implementation of this practice. Lake County is the only county noted to make a comprehensive effort to notify absentee voters that their ballot was rejected based on a perceived signature mismatch, but any such notice does not come until after election day, by which time it is too late for a voter to challenge or cure. [*Id.*, p. 7, ¶ 23.]

---

[3] Also available at
https://www.in.gov/sos/elections/files/Absentee_Voter_Bill_of_Rights_(2009_revision).pdf, last accessed March 2, 2020.

St. Joseph County and Indiana Election Facts

47.     Catherine Fanello has served as the Democratic appointee to the St. Joseph County Election Board (the "Board") since January 2014. [Excerpts from the Deposition of Mary Catherine Fanello Zwierzynski, ECF 67-10, pp. 6-7, (int. pp. 6:21-7:3).] The Board is duly constituted pursuant to I.C. § 3-6-5-1 and -2. [ECF 14, pp. 9-10, ¶¶ 36-37; ECF 24, p. 12, ¶ 36.] The Board is responsible for conducting all elections and administering the election laws of Indiana within the county. I.C. § 3-6-5-14(a)(1); [ECF 67-10 at 9 (int. p. 9:2-6).].

48.     St. Joseph County, however, began counting absentee ballots centrally beginning with the 2018 elections, after a unanimous vote of the Board. [ECF 67-10 at 10 (int. p. 10:3-12).] The Board decided to change to a central count because the "Indiana Election Code with regard to absentee ballots is extremely difficult to understand and process. And our precinct poll workers were having a difficult time processing absentees at the precinct." [*Id*. at 10-11 (int. pp. 10:24-11:3.]

49.     If the voter fails to sign the application, there is "no requirement in the Indiana Election Code for the county election board to contact a voter who submits an incomplete absentee ballot application," though the Manual notes that some counties have adopted policies to contact the voter who submits an incomplete application to give the voter a chance to cure this oversight. [ECF 67-1 at 27 (int. p. 112).] St. Joseph County election officials sometimes notify voters who mail an application for an absentee ballot, but do not appear on the registration list. [ECF 67-10 at 58 (int. p. 73:8-18).]

50.     The election board does not review absentee ballots unless the bipartisan counters disagree. If the bipartisan counters agree, the ballot is either counted or rejected without further review. If they disagree, the dispute is brought to the election board for final resolution. [ECF 67-10 at 37 (int. p. 37:14-21).] Once the election board has made a decision not to count an absentee ballot based on a signature comparison, that decision is final and unreviewable. [*Id*. at 78-79 (int. pp. 105:24-106:5).]

51.     On election day the only signature comparison that takes place is between the signature on the absentee ballot application (required by I.C. § 3-11-4-2) and the signature on the security envelope containing the voter's absentee ballot. [ECF 67-10 at 28 (int. p. 28:8-15).]

52.     In the November 2018 general election, out of some 22,000 total absentee ballots cast, 95 mail-in absentee ballots in St. Joseph County were rejected for various reasons, 39 of which were based on perceptions that the voter's signatures did not match. [ECF 67-10 at 38 (int. p. 38:10).]

53.     Voters who cast mail-in absentee ballots that are rejected based on this signature comparison process are not given notice that their absentee ballot has been rejected due to a determination that that their signature was determined not to be "genuine," under I.C. § 3-11.5-4-4, or because their signatures did not "correspond," pursuant to I.C. § 3-11.5-4-12(a)(2). Ms. Fanello testified that no notice is given because there is no provision in Indiana law requiring or providing any instructions to notify the voter that his or her absentee ballot has been rejected. [ECF 67-10 at 15-16 (int. pp. 15:11-16:2).]

54.     Thus, voters whose mail-in absentee ballot has been rejected because of a determination that his or her signature is not genuine have no opportunity to challenge such a determination. [ECF 67-10 at 20 (int. p. 20:2-12).]

55.     Because the Indiana Code does not define either "genuine" or "correspond," the Board treats those terms the same. [*Id.* at 31 (int. p. 31:2-10).] Ms. Fanello regards those words as being "fairly similar." [*Id.* at 77 (int. p. 104:1-7).]

56.     By comparison, voters who cast a provisional ballot because, for example, they lacked the proper form of photographic identification, have ten (10) days to appear and present such photographic identification required by I.C. § 3-11-8-25.1, § 3-11.7-5-2.5(a). [*Id.* at 21 (int. p. 21:1-24).]

57.     The Indiana Code also provides no standards or guidelines for election boards or absentee ballot counters to use in determining whether an absentee voter's signature is "genuine." [*Id.* at 17 (int. p. 17:2-15).]

58.     The State provides no training for members of county election boards in handwriting or signature analysis. [*Id.* (int. p. 17:19-25.)] Nor does the election code or State election officials require local election boards to hire a handwriting analysis expert to train themselves or absentee ballot counters in signature analysis, or provide any guidelines for determining whether an absentee voter's signature is genuine. [*Id.* at 18 (int. p. 18:1-19:12).]

59.     The State does provide instructions to county election officials in the Election Administrators' Manual, including instructions for the absentee ballot process. [*Id.* at 23-24 (int. pp. 23:2-24:10; and see ECF 67-1 at 14-47 (int. pp. 99-132).]

60.     Those instructions, though not binding on county election officials, represent the best efforts of the co-directors of the Indiana Election Division ("IED"), one Democratic and one Republican, to interpret Indiana election law. (Excerpts from the Deposition of Angela M. Nussmeyer, ECF 67-11, at 8-9 (int. pp. 31:3-32:4).] The Manual represents a bipartisan consensus as to IED policy. [*Id.*] The Manual is a "roadmap for the county election administrator to follow," and provides instructions to county election officials for the absentee ballot process. [ECF 67-1 at 14 (int. p. 99).]

61.     The Manual contains advice to county election officials in interpreting and administering Indiana election law. [ECF 67-11 at 16 (int. p. 68:7-13). The Manual is replete with references to the signature verification process. [*See*, e.g., ECF 67-1 at 31-32, 36-37 (int. pp. 116-17, 121-22.]

62.     Those instructions for processing absentee applications and ballots first require a county election board to determine if the applicant is a registered voter and that her application has been completed and filed in accordance with Indiana law. [ECF 67-1 at 26 (int. p. 111).]

63.     The Manual notes that "there is "no requirement in the Indiana Election Code for a county election board to contact a voter who submits an incomplete absentee ballot

application," though some election boards have adopted policies for contacting voters who submit incomplete applications. [ECF 67-1 at 27 (int. p. 112).]

64.     This is the practice, for instance, of the St. Joseph County Election Board, where absentee ballot supervisors "actually attempt to contact the voter" whose absentee ballot application has been rejected because it is unsigned or the voter's signature is questioned based on a signature comparison "to give them an opportunity to submit a new application, if it's within the time they can submit an application." [ECF 67-10 at 49 (int. p. 56:1-7).]

65.     In fact, records produced by the St. Joseph County Election Board in discovery and identified by Ms. Fanello in her deposition reflect that voters are often mailed new applications, even developing and mailing out to such voters a letter to let them know there was an issue with their application and that they might want to consider voting in person on election day. [*Id.* at 49-51 (int. pp. 56-58).]

66.     Unless an application is challenged, the board is required ordinarily to mail an absentee ballot "on the day of the receipt of the voter's application." I.C. § 3-11-4-18(c).

67.     I.C. § 3-11-4-1, et seq., requires an initial review by a county election board of the signature on an application for an absentee ballot. Specifically, a member of the county election board may file an affidavit challenging an application based on reasons set forth in I.C. § 3-11-4-18.5(a). [*Id.* at 45-46 (int. pp. 52:13-53:1.]

68.     The procedures for reviewing an absentee ballot application differ in significant respects from the above-described procedures for comparing signatures after an absentee ballot has been received.

69.     Thus, I.C. § 3-11-4-17.5(a) requires a signature comparison between the applicant's signature on the voter registration record and on the application to determine if the signature on the application "substantially conforms" with the signature on the voter's voter registration record.

70.     In conducting this first-tier review, election officials are expressly required to take into account whether any "substantial difference between the signatures can be accounted for by age or disability of the voter." I.C. § 3-11-4-17.5(a)(3).

71.     No similar conditions, qualifications or guidelines are contained in the signature comparison statutes that are applicable after the voter's application has been approved and he or she has been mailed an absentee ballot, marked it, and mailed it back in.

72.     Moreover, because the signature comparison statutes requiring signature comparisons after an absentee ballot has been received by the election board don't require consideration of a voter's age, the election board simply uses its "best judgment" in making signature comparisons on election day. [ECF 67-10 at 94 (int. p. 123:3-6).]

73.     After an application has been approved, election boards are required to include with the ballot and security envelope and affidavit what is known as the Absentee Voter's Bill of Rights. I.C. § 3-5-8-2.5. [*See also* ECF 67-9.]

74.     Nothing in the Absentee Voter's Bill of Rights alerts a voter who is eligible to cast a mail-in absentee ballot that election officials are required to perform a signature comparison, or that an absentee ballot may be rejected because of a perception that his or her signatures do not correspond to either the voter's signature on the application or the signature in the State's voter database. [ECF 67-9.]

75.     By the time the election board makes a determination on election day to reject an absentee ballot based on signature comparison, it is too late to notify the voter. [ECF 67-10 at 62 (int. p. 77:5-10).]

76.     Ms. Fanello testified that with respect to the absentee ballots of the named Plaintiffs (Collier, for example), it was too late to notify him that his ballot was rejected, and Indiana law does not require such notice in any event. [*Id.* at 63 (int. p. 78:1-15).]

77.     Ms. Fanello knows that the 39 absentee ballots with "rejected" stickers were reviewed on election day and that on election day the only signatures compared are those on the application and the ballot envelope. [*Id.* at 68-69 (int. pp. 83:16-84:15.]

78.     Even if a decision is made before election day that an absentee ballot envelope has a non-genuine signature, the affected voter is still not notified. [*Id.* at 76 (int. p. 103:8-22).]

79.     The Board has never made a referral to the county prosecutor's office of any voter whose signature on an absentee ballot envelope was determined to be non-genuine, and neither has it determined to conduct an investigation. [*Id.* at 84-85 (int. pp. 111:13-112:19).]

80.     Ms. Fanello has no personal knowledge of any St. Joseph County voter has been charged with or committed [absentee? or any other form of] voting fraud. [*Id.* at 87 (int. p. 114:16-25).]

The Honorable Billie Breaux

81.     The Honorable Billie Breaux is a resident of Indianapolis, Indiana, and has been registered to vote at the same address since 2007. [Declaration of Billie Breaux, ECF 67-12, p. 1, ¶ 1.] Senator Breaux served in the Indiana State Senate from 1990 until 2006. [*Id.* at 2, ¶ 4.]. Senator Breaux then served as Marion County Auditor from 2006-2014. [*Id.*, ¶ 5.]

82.     Senator Breaux signed and sent an application for an absentee ballot by mail in September 2018. [*Id.*, ¶ 7.] She was eligible to do so due to her age. [*Id.*, pp. 1-2, ¶¶ 1, 7.] On or around October 23, 2018, Senator Breaux marked her absentee ballot, placed it in the security envelope and signed the affidavit on the security envelope. [*Id.*, p. 2, ¶ 8.]

83.     Senator Breaux discovered only in January 2020 that her absentee ballot had been rejected because election workers had determined one of her signatures was not genuine or

did not match. [ECF 67-12, p. 2, ¶ 9.] Senator Breaux was never informed by Marion County election officials that her absentee ballot was rejected. [*Id.*, p. 3 ¶ 10.] Had Senator Breaux been notified of concerns regarding the genuineness of her signature, she would have provided confirmation. [*Id.*, ¶ 11.]

**B.    Statement of Material Facts in Dispute in Opposition to Defendant's Supporting Motion for Summary Judgment.**

84.    The Secretary claims that local county election officials may give some deference to signatures based on the disability of the voter. [ECF 64 at 3, citing ECF 63-1 (int. p. 120); and I.C. § 3-5-6-6.] The implication that this deference is relevant to this action, however, is disputed, because it did not and does not apply to the non-disabled individual plaintiffs whose ballots were rejected without notice.

85.    The Secretary claims that voters with disabilities have the opportunity to request attestation of their signature by specified individuals or the absentee voter board. [ECF 64 at 3, citing I.C. §§ 3-11.5-4- 13(b)-(c); 3-11-10-24, -25.] While true as far as it goes, this claim is also irrelevant to this action because, other than Ms. Clark who voted before a traveling board and is of an extremely advanced age, none of the Plaintiffs claims to be eligible to vote by mailing in an absentee ballot because they are disabled.

## IV.    <u>Legal Standard</u>

"Summary judgment is warranted `if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "A dispute is `genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "`As to materiality, the substantive law will identify which facts are material.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The non-moving party cannot avoid summary judgment by disputing issues which are irrelevant or unnecessary. *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citation omitted). A court will find there is no genuine dispute of a material fact where: (a) the moving party presents expert testimony to establish that fact; and (b) the non-moving party fails to present expert testimony in rebuttal. *See Fields v. Smith*, 653 F.3d 550, 554-56 (7th Cir. 2011) (finding that prison officials withheld effective medical treatment for inmates' serious

medical needs where: (a) inmates presented expert testimony that the withheld treatment was the only adequate treatment for their serious medical needs; and (b) the state failed to present expert evidence to rebut inmates' expert testimony that alternative treatments were ineffective).

When the court is confronted with cross-motions for summary judgment, the motions are taken one at a time, construing all facts and drawing all reasonable inferences in favor of the nonmovant. *Steimel v. Wernert*, 823 F.3d 902, 910 (7th Cir. 2016) (citing *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015).

## V.   Argument in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.[4]

Plaintiffs have alleged two counts against Secretary Lawson in their First Amended Complaint, for which they seek declaratory and injunctive relief. [ECF 14, pp. 13-18.] The individual plaintiffs have standing because their injuries are neither speculative nor remote; and CCI has both organizational and associational standing. Plaintiffs are entitled to summary judgment on their Fourteenth Amendment claims as a matter of law because the undisputed material facts demonstrate that Plaintiffs' rights to vote, to due process, and to equal protection of the laws, have been violated by the implementation of state law that arbitrarily and capriciously disenfranchises voters.

### A.    Plaintiffs have standing to bring this constitutional challenge.

1. The individual Plaintiffs' injuries are neither speculative nor remote.

The Secretary argues that the individual Plaintiffs have suffered no injury-in-fact [ECF 64 at 5-6], despite the undisputed fact that their respective absentee ballots were rejected and their

---

[4] The arguments that support Plaintiffs' Cross-Motion for Summary Judgment and those that oppose Defendant's Motion for Summary Judgment are, for the most part, two sides of the same coin. Accordingly, Plaintiffs' Argument section combines both, instead of first presenting the former and then reiterating the latter.

votes uncounted because of erroneous determinations that their respective signatures were not genuine. [Facts 1, 2, 4, 5, 7, 8.] The signatures of some Plaintiffs vary, and some worry their ballots will be wrongfully rejected again in the future. [Facts 3, 6, 9.] Nevertheless, the Secretary claims they suffered no constitutional injury because "there is no constitutional right to cast a vote by mail-in absentee ballot." [ECF 64 at 6.] While absentee voting is not accorded constitutional protection and the State thus could eliminate absentee voting if it wished, Indiana has chosen to allow voters who meet certain statutory conditions to vote by mail-in absentee ballot. This includes qualified voters who are at least 65 years of age or older, such as Plaintiffs Frederick, Clark, and Marks, or those voters such as Plaintiff Collier who have a reasonable expectation of being absent from the jurisdiction or scheduled to work during the 12 hours the polls are open on election day. [Facts 1, 4, 7.] Those categories of voters are by statute qualified and entitled to vote by mailing in an absentee ballot. I.C. §§ 3-11-10-24 and -25.[5]

Denying an eligible voter the right to have her vote counted is a form of tangible harm. *Reynolds v. Sims,* 377 U.S. 533, 554 (1964); *Shipley v. Chicago Bd. of Election Comm'rs,* ___ F.3d ___, 2020 WL 412839, *10 (7th Cir. Jan. 27, 2020) (plaintiffs failed to state a constitutional claim for violation of the right to vote because they could not show nor did they allege that the challenged statute had resulted in the "discard[ing of] any vote cast"). Here, by contrast to the *Shipley* plaintiffs, the individual plaintiffs have demonstrated through their undisputed testimony that their absentee ballots were wrongly rejected based upon an erroneous determination by election officials, acting under the color of law and the challenged statutes, that their respective signatures were not "genuine."

---

[5] Submitting a mail-in absentee ballot is distinguished from casting an early in-person absentee ballot authorized by Ind. Code § 3-11-10-26.

The Secretary's reliance on the fact that there is no constitutional right to vote by absentee ballot is irrelevant. Once a State creates an absentee voting regime, it "must administer it in accordance with the Constitution." *Martin v. Kemp,* 341 F.Supp.3d 1326, 1338 (N.D. Ga. 2018); *Saucedo v. Gardner,* 335 F.Supp.3d 202, 217 (D. N.H. 2018) (both quoting *Zessar v. Helander,* 2006 U.S. Dist. LEXIS 9830, 2006 WL 642646 (N.D. Ill. 2006), *vacated as moot sub nom. Zessar v. Keith,* 536 F.3d 788 (7th Cir. 2008)). Accordingly, a statutory regime permitting mail-in voting by absentee ballot must comply with the Due Process and Equal Protection clauses of the Fourteenth Amendment.

While the right to vote by absentee ballot is not in itself a fundamental right, a voter has a sufficient liberty interest entitled to protection under the due process clause of the Fourteenth Amendment once the State permits voters to vote absentee. *Raetzel v. Parks/Bellemont Absentee Election Bd.,* 762 F.Supp. 1354 (D. Ariz. 1990) (Arizona absentee voting statute which failed to provide absentee voters with any post-deprivation notice or opportunity to be heard when their ballots were rejected did not afford adequate due process); *see also One Wisconsin Instit., Inc. v. Thomsen,* 198 F.Supp.3d 896, 933 (W.D. Wis. 2016) (following *Zessar,* distinguishing *Griffin v. Roupas,* 385 F.3d 1128 (7th Cir. 2004), and noting the substantive difference between, on the one hand, an allegation that the state is denying or burdening plaintiffs' opportunity to exercise the right to submit an absentee ballot and, on the other, claiming that the state is constitutionally required to allow unlimited absentee voting). That voting by mail-in absentee ballot is a right created by state statute does not impact the due process analysis, as the Supreme Court has long held that a state's statutory entitlements can trigger due process protections. *Goldberg v. Kelly,* 397 U.S. 254, 262 (1970); *Bell v. Burson,* 402 U.S. 535 (1971) (statutory entitlement under state law to a driver's license triggers due process protections); *Perry v. Sindermann,* 408 U.S. 593, 601 (1972) (protectible interests for due process consideration are not created by the Constitution but by

rules or understandings "that stem from an independent source *such as state law*.") (emphasis added).

By ignoring the clear injury Plaintiffs have suffered from their ballots being wrongly rejected and not counted, the Secretary inaptly equates Plaintiffs' injuries to mere election "irregularities" which do not give rise to a constitutional claim under § 1983, citing *Hennings v. Grafton*, 523 F.2d 861 (7th Cir. 1975). But Plaintiffs allege more than mere "garden variety" election irregularities: they contend that because the signature matching statutes, both on their face and as applied to them, did not require that they be notified of the rejection of their absentee ballot, nor grant them an opportunity to cure any erroneous determination, the statutes violate the Due Process Clause of the Fourteenth Amendment. Moreover, because the statutes impose a generalized and unjustified burden on the fundamental right to vote resulting in wrongful disenfranchisement, the statutes also impose a significant and unjustified burden on Plaintiffs' rights to vote and have their vote counted, and thus violate the Equal Protection Clause of the Fourteenth Amendment.[6]  The individual Plaintiffs have suffered injuries in fact, may suffer similarly in the future, and have standing to bring these claims.

2.  <u>Neither willful nor intentional conduct is required.</u>

The Secretary also contends Plaintiffs lack standing because they have made no allegation of willful or intentional conduct. [ECF 64 at 8.] But apart from cases involving "garden variety" election irregularities of the type that do not rise to the level of a constitutional claim and require allegations and proof of intent, *see*, e.g., *Dieckhoff v. Severson*, 915 F.2d 1145, 1150 (7th Cir. 1990), challenges to state election laws such as these that result in a generalized burden on the

---

[6] Plaintiffs also have standing to bring their Equal Protection claim, which is discussed *infra* at Sec. V(C).

fundamental right to vote do not require plaintiffs to demonstrate discriminatory intent. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019). The Secretary cites no cases in which a court has required a showing of willfulness in a case such as this where Plaintiffs allege and have provided undisputed evidence that the implementation of election laws results in the systemic wrongful disenfranchisement of a substantial number of absentee ballots. [Facts 2, 5, 8, 25, 26, 28-36, 40, 42-46.] Plaintiffs have been directly injured by the application of the challenged statutes causing their ballots to be rejected and not counted, and thus have standing to bring this constitutional challenge.[7]

> 3. <u>CCI has both organizational and associational standing to seek both injunctive and declaratory relief.</u>

The Secretary contends CCI lacks organizational status on behalf of itself or its members.[8] [ECF 64 at 9-10.] Julia Vaughn is the Policy Director of CCI, which is the Indiana affiliate of Common Cause, a national non-partisan grassroots organization that advocates for, among other things, the elimination of barriers to voting. [Facts 10-12.] CCI has about 14,000 members who live and vote in Indiana. [Fact 10.] These statutes harm CCI's mission of reducing barriers to voting. [Fact 17.] After becoming aware of erroneous absentee ballot rejections, and because over half of its members are 65 years of age or older who are entitled to vote by mail-in

---

[7] The Secretary's claims [ECF 64 at 8-9], that Plaintiffs lack third-party standing to challenge the signature-matching statutes on behalf of other voters are irrelevant. The Supreme Court has never held that individual voters who challenge state election laws that are alleged either to violate due process or impose an undue burden on the right to vote may maintain such claims only as a class action on behalf of all affected voters. The Secretary's arguments in this respect are undeveloped and unsupported by authority, and are, therefore, waived. *Coleman v. Hardy*, 690 F.3d 811, 818-19 (7th Cir. 2012) (citing *Pond v. Michelin North America, Inc.*, 183 F.3d 592, 597 (7th Cir. 1999)).

[8] Although both the individual and organization Plaintiffs have standing, only one plaintiff need have standing. *Crawford v. Marion County Election Board*, 553 U.S. 181, 189 n. 7 (2008).

absentee ballot, CCI devoted time and resources to notifying its members of the risks that a mail-in absentee ballot might be rejected by untrained election workers. [Facts 16-18.] CCI also will conduct activities such as training sessions aimed at educating voters and community activists about the increased risk of erroneous absentee ballot rejections. [Facts 18, 19.] This of necessity will divert time and resources from its lobbying activities and its other voter education and assistance efforts. [Fact 20.]

The Secretary cites but a single case, *Common Cause Indiana v. Lawson*, 937 F. 3d 944, 949 (7th Cir. 2019), in support of its argument that CCI lacks organizational standing. [ECF 64 at 9-10.] Ironically, the Seventh Circuit specifically rejected Indiana's challenge to CCI's organizational standing, where CCI and other organizations challenged (under the National Voter Registration Act), an Indiana statute that allowed Indiana to immediately remove a voter based on information received from a third-party database rather than in response to a direct contact from a voter. The court noted that a voting law can injure an organization enough to confer standing "by compelling [it] to devote resources" to combatting the effects of that law that are harmful to its missions. *Common Cause Indiana*, 937 F. 3d at 950 (quoting *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007)). The Seventh Circuit held that an organization may rely on not only actual harm, but also imminent harm, for standing. *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (basing standing of organization devoted to opposing abortion "not on anything the organization had already done, but instead on specific statements that it intended to make in future election cycles")).

*Common Cause Indiana* was the latest in a string of rulings finding that CCI has organizational standing to challenge state election laws that abridge or burden its members' right to vote. *See also Common Cause Indiana v. Sec'y of State*, 60 F.Supp.3d 982, 986-88 (S.D. Ind. 2014), *aff'd sub nom. Common Cause Indiana v. Indiana Election Comm'n*, 800 F.3d 913, 914 (7th Cir. 2015)

23

(assuming that CCI had standing on behalf of Indiana voters to challenge  statutes establishing processes for electing judges to the Marion Superior Court); *Common Cause Indiana v. Marion County Election Board*, 311 F. Supp. 3d 949 (S.D. Ind. 2018) (presuming CCI's standing to seek to enjoin defendants from failing to provide satellite voting opportunities for Marion County voters).

CCI also has associational standing to pursue both declaratory and injunctive relief because "(1) at least one of its members would otherwise have standing; (2) the interests at stake in this litigation are germane to its organizational purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit." *Gaylor v. Mnuchin*, 919 F.3d 420, 426 (7th Cir. 2019) (quoting *Sierra Club v. Franklin Cty. Power of Ill.*, 546 F.3d 918, 924 (7th Cir. 2008)). Although none of the individual Plaintiffs is a member of CCI,[9] Vaughn avers that there is a statistical certainty, or at least a realistic likelihood, that at least one member of CCI has already had their mail-in absentee ballot rejected due to a perceived signature mismatch or will have their mail-in absentee ballot rejected for that reason in the future. [Fact 23.] This is all associational standing requires: that one member faces a realistic danger of having a registration (or ballot) rejected due to a mistaken mismatch. *Florida St. Conf. NAACP v. Browning*, 522 F.3d 1153, 1162-63 (11th Cir. 2008). Moreover, there is no need to name a particular member where future probabilistic injury to an unidentified member is certain. *Id.* at 1164 (citing *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

Absolute certainly of future injury is not required, as a probabilistic injury will suffice even where the probability that the harm will occur is small. *In re C.P. Hall Co. v. Columbia Casualty Co.*, 750 F.3d 659, 660-61 (7th Cir. 2014); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d

---

[9] The individual participation of members of an organization is not normally necessary when an association (as here) seeks only prospective injunctive relief for its members. *United Food & Commercial Workers Local 751 v. Brown Group, Inc.*, 517 U.S. 544 546 (1996).

742, 744 (7th Cir. 2007) ("[S]tanding in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened."); *Walters v. Edgar*, 163 F.3d 430 (7th Cir. 1998) ("A probabilistic harm, if nontrivial, can support standing," citing *inter alia Clinton v. City of New York*, 524 U.S. 417 (1998)); *Fla. Democratic Party v. Detzner*, 2016 WL 6090943 *4 (N.D. Fla. 2016) (political organization plaintiff had standing to challenge the signature mismatch statutes without identifying a specific voter who had been harmed because some voters inevitably would be). For the foregoing reasons, CCI has standing to seek injunctive and declaratory relief.

> 4. <u>Secretary Lawson is a proper defendant</u>

Secretary Lawson next contends that Plaintiffs lack standing because she cannot redress Plaintiffs' injuries and plays no role in implementing the signature-comparison statutes at issue. [ECF 64 at 10-12.] Again, she cites no relevant case authority in support of her argument. Plaintiffs allege Secretary Lawson, who is sued only in her official capacity, is the chief election official of the State pursuant to I.C. § 3-6-3.7-1; that she enforces and implements Indiana election law and routinely issues guidance about that law; and that she is charged with performing all ministerial duties "related to the administration of elections by the state." I.C. § 3-6-4.2-2(a), [ECF 14, p. 10, ¶ 35]. She is assisted in the performance of those duties and in the "administration of this title" by the election division. I.C. § 3-6-4.2-2(b). Through the co-directors of the Indiana Election Division and via the Indiana Election Administrator's Manual, the Secretary routinely issues guidance to county election officials in each of Indiana's 92 counties. That Manual, which is a "roadmap for the county election administrator to follow," provides instructions to county election officials for the absentee ballot process. [Fact 60.] The Manual is the product of bipartisan consensus between the two co-directors of the Indiana Election Division and represents election policy. [*Id.*] Though not binding on county election officials, it represents

the best efforts of the co-directors of the Indiana Election Division, one Democratic and one Republican, to assist Secretary Lawson to aid county election officials in interpreting and administering Indiana election law. [*Id.*] The Secretary's claim that she does not implement policies that counties rely on in implementing the signature verification process" [ECF 64 at 11], is contradicted both by the law and the undisputed facts. Indeed, the Manual is replete with references to the signature verification process. [Fact 61.]

Official capacity suits against State officials which seek prospective relief, such as this one, are permitted by 42 U.S.C. § 1983 only as long as the named official has some "role to play in the enforcement of the challenged statutes," or legal responsibility for effectuating the statute at issue. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10 (1989); *Ex parte Young*, 209 U.S. 123 (1908); *Hearne v. Bd. of Ed, City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) (noting that the governor played no role in the enforcement of the challenged statutes or any responsibility for the flaws in those statutes); *Takle v. Univ. of Wisc. Hospital*, 402 F. 3d 768, 772 (7th Cir. 2005) (§ 1983 suits for injunctive relief permitted against "responsible state officials").

Here, Secretary Lawson is the State's "chief election official," who, in combination with the Indiana Election Division, is ultimately responsible for administering *all* of Indiana's election laws and for performing *all* ministerial duties related to the administration of elections. I.C. § 3-6-4.2-2(a) and (b). She is thus a proper defendant because she is sufficiently connected with the enforcement of the challenged election laws. *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011) (concluding that as the official charged with enforcing Georgia's election code, Secretary of State was a proper party in a suit for injunctive and declaratory relief); *Mo. Prot. & Advocacy Servs. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (holding that although elections were administered by local election officials, the secretary of state as the state's chief election official was proper party defendant for implementing any injunctive relief); *Fair Fight Action v. Raffensperger*, 2019 WL

6836774 (N.D. Ga. 2019) (secretary of state as state's chief election official had both the power and duty to insure that local election officials comply with state's election code); *Brooks v. Gant*, 2012 WL 4482984 (D.S.D. 2012) (rejecting claim by South Dakota secretary of state that he should be dismissed from § 1983 election suit based on his claim that any wrongdoing was the fault of local election officials); *American Broad. Cos., Inc. v. Ritchie*, 2011 WL 665858, at *3 (D. Minn. 2011) (noting that secretary of state was a proper defendant because he was the "chief election official in the state" who thus had a duty to implement any injunctions regarding state election laws); *see also Papasan v. Allain*, 478 U.S. 265, 282 n. 14 (1986) (holding that Mississippi secretary of state could be enjoined under *Ex parte Young* because by state statute he was responsible for the general supervision of the administration by local school officials of the challenged law).

Secretary Lawson acknowledges that the Seventh Circuit in *Common Cause Indiana v. Lawson* held that CCI had standing to sue her, 937 F.3d. at 955-56, but claims that ruling should be limited to the facts of that case and because the voter removal provisions being challenged in that case "were enforced by and through the Secretary." [ECF 64 at 12.] Though she may not personally compare signatures, in her role as Indiana's chief election official she most assuredly provides instructions to those election officials regarding how the signature-matching statutes are to be administered. Thus, her general supervisory role over Indiana's election laws is more than sufficient for Plaintiffs to have named her as an official capacity defendant.

Other courts have found secretaries of state as both necessary and appropriate defendants in suits challenging signature matching laws even though the day-to-day implementation of those laws falls primarily on local election officials. *Saucedo*, 335 F.Supp.3d at 222 (issuing permanent injunction against secretary of state and expressing confidence that although the enforcement of the signature-matching provision falls primarily on local election officials who are non-parties,

the secretary of state will take appropriate steps to ensure that this injunction is enforced); *Martin*, 341 F.Supp.3d at 1341 (ordering secretary of state's office to adopt procedures to remedy due process violations inherent in state's signature-matching statutes found to violate the Fourteenth Amendment); *Detzner*, 2016 WL 6090943 at **4-5 (secretary of state as chief election officer, responsible for general supervision and administration of state election laws, was proper defendant in suit challenging signature-matching statutes for mail-in absentee ballots).

For the foregoing reasons, Plaintiffs have suffered injury and have standing, and Secretary Lawson is an appropriate Defendant.

**B.     The Challenged Statutes Violate Plaintiffs' Due Process Rights.**

In claims alleging deprivations of due process, courts "are required to consider 'three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Bradley v. Village of University Park*, 929 F.3d 875, 882 (7th Cir. 2019) (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the undisputed facts demonstrate the private interests – to cast a ballot pursuant to state law – affected by the official statutes and rejections at issue. [Facts 1, 2, 4, 5, 7, 8, 16, 23, 33, 35, 36.] The facts and risk of the erroneous deprivation is attested to Dr. Mohammad and Ms. Blake. [Facts 25-36, 42-46].  Dr. Mohammad notes that wrongful rejections of ballots under Indiana law is "likely." [Facts 26, 28, 29, 33.] He also quantifies the potential chance of a wrongful rejection may be as high as 26.1%. [Fact 36.] The probable value of procedural safeguards is significant. Notifying voters of the rejection of their mail-in absentee ballots, and allowing them due process by some ability to cure, would inure to the benefit of all. Finally, any

additional or substitute procedural requirement would entail no significant burdens: indeed, the

Defendant has failed to identify any such burden at all in her brief. [ECF 64.] Election boards

and state law already anticipate and accommodate voters who have cast a provisional ballot.

*Crawford,* 553 U.S. at 186 ("A voter who has photo identification but is unable to present that

identification on election day may file a provisional ballot that will be counted if she brings her

photo identification to the circuit county clerk's office within 10 days. § 3-11.7-5-2.5(b)"). The St.

Joseph County Election Board routinely reaches out to voters who have submitted incomplete

applications, and Lake County notifies voters (after election day), if their ballot was rejected

based on a perceived signature mismatch [Facts 46, 49.] The same processes can be adopted

here, for the same reasons.

In *Zessar*, Illinois election law required that an absentee voter whose ballot was rejected as

a result of a statutorily-required comparison of the signatures on the application for absentee

ballot and on the ballot envelope was required to be provided with a written notice of such

rejection. *Zessar*, 2006 WL 642646 at *1. However, the statute gave no guidance about the time

frame for such notice, nor did it provide for a pre-rejection hearing. *Id.* The plaintiff claimed this

lack of timely notice and opportunity for a hearing deprived him of his fundamental right to vote.

*Id.* at *5.

The district court concluded that even though absentee voting is not a fundamental right,

once a state permits voters to vote by absentee ballot it must afford appropriate due process

protections. *Id.* at *6. The district court rejected the State's claim that this was just a "garden

variety" election irregularity with which the federal courts should not interfere, and that

constitutional due process protections applied. *Id.* at **5-7. The district court determined that

because the rejection of a voter's absentee ballot wholly deprived that voter of the right to vote,

without any remedy or recourse after the election, additional due process protections were

necessary, even though the risk of deprivation was not "tremendous." *Zessar*, 2006 WL 642646 at

*8. The district court additionally concluded that the State had not shown that the burden of

providing additional procedures was "so great as to overwhelm plaintiff's interest in protecting

his vote." *Id*. at *9.

Indiana law is considerably more lacking in due process protections than the Illinois

procedures found constitutionally deficient in *Zessar*. Indiana provides not even a scintilla of due

process protection to a voter whose absentee ballot is rejected based on the required signature

comparison. The voter is not alerted in the Absentee Voter's Bill of Rights that his or her

signatures will be scrutinized and compared by untrained election officials, or that his or her

ballot can be rejected based on a signature comparison. [Facts 44, 74.] Voters are generally not

notified either before or after the election of that rejection. [Facts 15, 22, 46 (Lake County does,

but is not by law required to, make notification efforts post-election).] And the signature-

matching statutes fail to provide election board members and absentee ballot counters with

functional standards for determining whether two signatures match or correspond; and they fail

to provide the voter with any semblance of a due process hearing or opportunity to contest that

rejection, which is final and unreviewable except in the rare cases involving a candidate-initiated

recount. [Facts 14, 25, 35, 46, 57.] Moreover, election officials charged with making these

signature comparisons are not provided with any training in handwriting or signature analysis.

[Facts 26, 35, 58.]

In *Detzner*, the district court declared Florida's statutory signature-matching scheme to

violate the Fourteenth Amendment because it gave voters whose absentee ballot was rejected

based on a signature-mismatch no opportunity to cure but provided such an opportunity for

voters who simply neglected to sign their ballot envelope.[10] *Detzner,* 2016 WL 6090943 at *1. As with Indiana's laws, Florida had no state-wide standards for evaluating whether signatures match, and the number of mismatched signature ballots varied widely from county to county. *Id.* at *3. The district court found that erroneously disenfranchising voters was a severe burden, that there was no evidence that any of the signature mismatches were the product of fraud, and that due process required that voters whose absentee ballot was invalidated for that reason be given timely notice and an opportunity to cure or contest those signature mismatches. *Id.* at **6-7. As a remedy, the district court ordered the secretary of state to issue a directive to all county election boards to stop enforcing the signature matching laws without counties providing affected absentee voters with the same right to cure as already afforded those voters who had simply neglected to sign the security envelope. *Id.* at *9. The district court agreed that preventing fraud was a legitimate state interest, but held that providing voters with an opportunity to contest a rejected ballot due to a perceived signature mismatch would aid in preventing fraud by allowing election officials to confirm voters' identity. *Id.* at *7.

In *Saucedo*, another district court struck down on due process grounds a New Hampshire statutory scheme with even greater protections for avoiding erroneous mismatch determinations than those present here, finding the challenged New Hampshire statutes lacked any functional standards for making signature comparisons and did not include any requirement for the training of the officials charged with making such determinations. *Saucedo*, 335 F.Supp.3d. at 206, 217-18. Like Indiana, the New Hampshire law included no procedures by which a voter could contest a

---

[10] The 2020 Election Administrator's Manual (ECF 67-1 at 27 (internal p. 112)), notes that although there is no requirement in the Indiana Election Code for a county election board to contact a voter who submits an incomplete absentee ballot application, some election boards have adopted policies whereby the voter who submitted the incomplete application is contacted and sent a new application. Such a policy of notifying voters who submitted an incomplete application has been adopted by the St. Joseph County Election Board. [Facts 49, 63, 64.]

determination that the voter's signatures did not match. *Saucedo*, 335 F.Supp.3d at 209. Citing *Raetzel, Zessar,* and an Iowa state court decision, the district court in *Saucedo* found that plaintiffs were entitled to summary judgment on their procedural due process claims. *Id.* at 215-16. It thus granted their request for declaratory relief that the challenged New Hampshire laws violated the Fourteenth Amendment, and it entered a permanent injunction, finding that the law was unconstitutional in all its applications because on its face it violated constitutional due process requirements, citing *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). *Id.* at 222.

Another district court recently declared that Georgia's signature-matching statutes for mail-in absentee ballots violated the due process guarantees of the Fourteenth Amendment, even though, in contrast to Indiana's, Georgia's signature-matching laws for absentee ballots required election officials to send a letter by first-class mail within three days of the rejection of a voter's absentee ballot for a signature mismatch, together with a written explanation of why the ballot was rejected, a new application, and an explanation of other ways the individual could cast his or her vote. *Martin*, 341 F. Supp.3d at 1330. Because the plaintiffs were unable to identify a voter to whom those statutes had been unconstitutionally applied,[11] the *Martin* court treated the challenge to be a facial rather than as-applied and refused to look beyond the statute's facial requirements. *Id.* at 1336-37. While noting that the statute required notification of the rejection to the voter, the court also observed that the statute neither provided the voter with a timely hearing nor an opportunity to appeal the decision to reject his or her absentee ballot. *Id.* at 1331, 1337.

After finding that due process guarantees apply to absentee voting, citing *Raetzel* and *Zessar*, and though recognizing that the risk of an erroneous deprivation was by no means "enormous," the district court held that the value of additional procedure outweighed any

---

[11] By contrast, Plaintiffs here have identified and presented sworn testimony from four voters whose mail-in absentee ballots were erroneously rejected. [Facts 1, 2, 4, 5, 7, 9, 82, 83.]

administrative inconvenience to the state. *Martin*, 341 F. Supp.3d at 1339. The district court therefore issued a permanent injunction ordering the state to essentially adopt the provisional ballot process already in place and to mark all absentee ballots as provisional where a signature mismatch is perceived, and then to provide pre-rejection notice to the absentee voter along with an opportunity to resolve the alleged signature discrepancy. *Id.* at 1339-40.

Requiring a similar provisional ballot process would not impose any undue fiscal and administrative burdens on Indiana election officials, given that the State already has post-election but pre-certification procedures in place for voters who cast a provisional ballot because, for example, the voter was unable to produce the required form of identification at the polls on election day. *See* I.C. § 3-11.7-5-2.5. Thus, any additional administrative burdens on the State would be minimal, especially when weighed against the risk of erroneous deprivations of the right to vote, for "even one disenfranchised voter—let alone several thousand—is too many." *Lee,* 915 F.3d at 1321 (quoting *League of Women Voters of N. Car. v. North Carolina,* 769 F.3d 224, 244 (4th Cir. 2014)). For all of the foregoing reasons, the challenged statutes violate Plaintiffs' due process rights.

### C. The Challenged Statutes Violate Plaintiffs' Equal Protection Rights.

The challenged statutes impose a generalized burden on the fundamental right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment. Because their application resulted in the individual Plaintiffs' wrongful disenfranchisement, the statutes impose a significant and unjustified burden on their right to vote and to have their vote counted.

The Equal Protection claim is governed by the flexible approach formulated by the U.S. Supreme Court long after *Hennings* in lieu of a traditional equal protection inquiry. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992); and *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008); *see also Lee*, 915 F.3d at 1319. This flexible approach,

which applies to *"all* First and Fourteenth Amendment challenges to state election laws," requires a "practical assessment of the challenged scheme's justifications and effects," and is governed by a two-step analysis. *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (emphasis in original) (citing Burdick, 504 U.S. at 432-34; and quoting *Stone v. Bd. of Election Comm'rs for City of Chicago,* 750 F.3d 678, 681 (7th Cir. 2014)). Under this approach, the court must first consider the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that Plaintiffs seek to vindicate." *Id.* (quoting *Anderson*, 460 U.S. at 789). The court then must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and weigh those interests against the burdened rights. In so doing courts look to the "legitimacy and strength" of the proffered interests, as well as "the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Id.* (emphasis added) (quoting *Anderson*, 460 U.S. at 789).

Here, a practical assessment of the scheme's effects and the injuries is straightforward: the burdens are substantial, for the plaintiffs were wrongly disenfranchised. [Facts 1, 2, 4, 5, 7, 8; *and see Lee*, 915 F.3d at 1319-21.] So were Senator Billie Breaux and potentially others. [Facts 42, 82-83.] Voters are likely to be wrongly disenfranchised in the future. [Facts 26, 28, 29, 33-36, 43.] Counties will treat their voters differently, without standards, and will act arbitrarily or capriciously in rejecting mail-in absentee ballots because signatures are determined non-genuine. [Facts 25, 26, 28, 29, 32-36, 39, 43, 45, 46.] Laypersons – such as those who currently make the determinations – may declare an authentic signature non-genuine in 26.1% of cases. [Fact 36.]

The State does cite interests for the statutes:  preventing "election fraud"; the orderly administration of elections; and accurate recordkeeping. [ECF 64 at 14-16.] But the facts are clear: there is no record evidence of any criminal referrals ever being made in connection with mail-in absentee ballots; and there is no evidence of absentee voter fraud of this type. [Facts 79,

80.] Further, criminal statutes exist for the purpose of such deterrence, and the burden on the plaintiffs' rights imposed by the challenged statutes is, at root, simply unnecessary to accomplish the stated goals.  And, just as in *Detzner*, providing voters with an opportunity to contest a rejected ballot due to a perceived signature mismatch would aid in preventing fraud, and promote orderly administration and accurate recordkeeping, by allowing election officials to confirm voters' identity. *See Detzner*, 2016 WL 6090943 at *7; *and see Lee*, 915 F.3d at 1321-26 (burden on voters outweighs the identified state interests). For these reasons, and those discussed *supra* in Sec. V(B), the challenged statutes impose a significant and unjustified burden on the individual Plaintiffs' right to vote and to have their vote counted; and thus violate the Equal Protection Clause of the Fourteenth Amendment.

## VI.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs, by counsel, request that the Court grant their Cross-Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and grant Plaintiffs all appropriate relief.

Respectfully submitted,

<u>*s/ William R. Groth*</u>
William R. Groth
MACEY SWANSON LLP
445 N. Pennsylvania St., Suite 401
Indianapolis, IN  46204
Tel: (317) 637-2345, Ext. 132
WGroth@fdgtlaborlaw.com

<u>*s/ Mark W. Sniderman*</u>
Mark W. Sniderman
FINDLING, PARK, CONYERS,
 WOODY & SNIDERMAN, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN  46204
Tel: (317) 231-1100
msniderman@findlingpark.com